IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bruce Powell, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | No. _____ |
| *-vs-* | ) | |
| | ) | *(Jury Demand)* |
| City of Chicago, Ronald Watts, | ) | |
| Phillip Cline, Debra Kirby, Douglas | ) | |
| Nichols, and Manuel Leano, | ) | |
| | ) | |
| | ) | |
| *Defendants* | ) | |

## COMPLAINT

Plaintiff, by counsel, alleges as follows:

### I.    Introduction

1.    Plaintiff Bruce Powell is one of many victims of the criminal enterprise run by convicted felon and former Chicago Police Sergeant Ronald Watts and his tactical team at the Ida B. Wells Homes in the 2000's.

2.    The Watts Gang of officers engaged in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges.

3.    High ranking officials within the Chicago Police Department were aware of the Watts Gang's criminal enterprise, but failed to take any action to stop it.

4.     The Chicago Police Department's official policies or customs of failing to discipline, supervise, and control its officers and of a "code of silence" were a proximate cause of the Watts Gang's criminal enterprise.

5.     The facts of this case provide a striking example of these official policies and customs: after a formal complaint was filed with the Chicago Police Department about Powell's mistreatment at the hands of Watts and his Gang, Watts himself was assigned to investigate the complaint.

6.     Watts Gang officers arrested Powell without probable cause, subjected him to an unlawful invasive search, fabricated evidence against him, and framed him for drug possession, a charge for which he was sentenced to two years in prison.

7.     Based on the powerful evidence that has come to light about the Watts Gang's nearly decade-long criminal enterprise, on July 10, 2017, the Circuit Court of Cook County granted the State's motion for a new trial and then to dismiss the charges against Powell.

8.     Powell brings this lawsuit to secure a remedy for his illegal incarceration, which was caused by: the Watts Gang, the failure of high-ranking officials within the Chicago Police Department to stop the Watts Gang, the code of silence within the Chicago Police Department, and the Chicago Police Department's defective discipline policy.

## II.     Parties and Jurisdiction

9.      This is a civil action arising under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1343 and 1367.

10.     Plaintiff Bruce Powell is a resident of the Northern District of Illinois.

11.     Defendant City of Chicago is an Illinois municipal corporation.

12.     Defendants Ronald Watts, Douglas Nichols, and Manual Leano (hereinafter "individual officer defendants") were at all relevant times acting under color of their offices as Chicago police officers. Plaintiff sues the individual officer defendants in their individual capacities.

13.     Defendant Philip Cline was at all relevant times Superintendent of the Chicago Police Department. Plaintiff sues Cline in his individual capacity.

14.     Defendant Debra Kirby was at all relevant times the Assistant Deputy Superintendent of the Chicago Police Department, acting as head of the Chicago Police Department Internal Affairs Division. Plaintiff sues Kirby in her individual capacity.

## III.     False Arrest and Illegal Prosecution of Plaintiff

15.     On July 17, 2009, plaintiff was lawfully standing on a sidewalk in the 3500 block of South King Drive in Chicago, Illinois.

16. Defendants Nichols and Leano approached plaintiff and placed him under arrest.

17. At the time of plaintiff's arrest:

   a. Neither Nichols nor Leano had a warrant authorizing the arrest of plaintiff and neither believed that a warrant had been issued authorizing the arrest of plaintiff;

   b. Neither Nichols nor Leano had observed plaintiff commit any offense; and

   c. Neither Nichols nor Leano had received information from any source that plaintiff had committed an offense.

18. Defendants Nichols and Leano then took plaintiff to a police station where they subjected plaintiff to intrusive searches of his anus.

19. Defendants Nichols and Leano knew that there was no legal basis for the searches.

20. Defendants Nichols and Leano did not find anything in their intrusive searches of plaintiff's anus.

21. Defendants Nichols and Leano prepared official police reports about their arrest of plaintiff and omitted any reference to the searches from those reports.

22. Other Chicago police officers later took plaintiff to a hospital to receive treatment for the injuries defendants Nichols and Leano had inflicted during their intrusive searches of plaintiff's anus.

23. After Nichols and Leano arrested plaintiff, they, together with defendant Watts, conspired, confederated, and agreed to fabricate a false story in an attempt to justify the unlawful arrest, to cover-up their wrongdoing, and to cause plaintiff to be wrongfully detained and prosecuted.

24. The false story fabricated by the officers included defendants Nichols and Leano's false claim that they arrested plaintiff after they observed him discard a clear plastic bag containing drugs.

25. The acts of the individual officer defendants in furtherance of their scheme to frame plaintiff included the following:

    a. One or more of the individual officer defendants prepared police reports containing the false story, and the other individual officer defendants each failed to intervene to prevent the violation of plaintiff's rights;

    b. One or more of the individual officer defendants attested through the official police reports that they were witnesses to the false story, and the other individual officer defendants

each failed to intervene to prevent the violation of plaintiff's rights;

c. Defendant Watts formally approved the official police reports, knowing that they contained the false story; and

d. One or more of the individual officer defendants communicated the false story to prosecutors, and the other individual officer defendants each failed to intervene to prevent the violation of plaintiff's rights.

26. Each of the individual officer defendants' wrongful acts was performed with knowledge that the acts would cause plaintiff to be wrongfully held in custody and falsely prosecuted for an offense that had never occurred.

27. Plaintiff was charged with possession of a controlled substance as a result of the above-described wrongful acts,.

28. Plaintiff knew that proving that the individual officer defendants had concocted the charges against him would not be possible.

29. Accordingly, even though he was innocent plaintiff pleaded guilty in exchange for a two-year sentence.

30. As a result of the above-described wrongful acts of the individual officer defendants, plaintiff was deprived of his liberty during his incarceration.

31. Plaintiff was continuously in custody from his arrest on July 17, 2009, until his release from the Illinois Department of Corrections on January 15, 2010.

32. Plaintiff challenged his conviction after he learned that federal prosecutors and lawyers for other wrongfully convicted individuals had uncovered evidence of the Watts Gang's criminal enterprise.

33. On July 10, 2017, he Circuit Court of Cook County granted the State's motion to set aside plaintiff's conviction; immediately thereafter, the Court granted the State's request to *nolle prosequi* the case.

### IV. The Defective Investigation of Plaintiff's Complaint

34. While he was in custody at the police station, plaintiff telephoned his sister to tell her about his false arrest and improper searches

35. In response to plaintiff's report of police wrongdoing, plaintiff's sister telephoned the Chicago Police Department and relayed plaintiff's report of misconduct.

36. Thereafter, the Department opened a formal investigation, which included the following summary by an officer of the allegations:

The complainant stated that the victim telephoned her from the 002nd District Police Station. The victim alleged to the complainant that he had been falsely arrested and that an officer searched the victim's anus three times looking for drugs. The victim also told the complainant that a sergeant instructed him not to say anything about what occurred and that the police would take care of him in court.

37. In accordance with the official policies of the Police Department of the City of Chicago, defendant Watts was assigned to investigate the complaint against himself and officers working for him.

38. Watts created a formal report containing the misleading statement g that he had contacted plaintiff's sister two weeks after the arrest and that she was unwilling to cooperate in the investigation.

39. About one month later, defendant Watts asked for the investigation of the complaint to be reassigned.

40. The complaint was reassigned to another officer who never attempted to contact plaintiff's sister or plaintiff.

41. The complaint was closed and the allegations determined to be unfounded based on Watts's misleading statement that plaintiff's sister would not cooperate in the investigation.

### V. Powell's Arrest and Prosecution Were Part of a Long-Running Pattern Known to High Ranking Officials within the Chicago Police Department

42. Before the Watts Gang engineered plaintiff's above-described wrongful arrest, detention, and prosecution, the Chicago Police Department

had received numerous civilian complaints that defendant Watts and the Watts Gang were engaging in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes.

43.    These civilian complaints were corroborated by information criminal investigators obtained from multiple cooperating witnesses.

44.    Before the Watts Gang engineered plaintiff's above-described wrongful arrest, unreasonable search, detention, and prosecution, defendants Cline and Kirby knew about the above-described credible allegations of serious wrongdoing by Watts and the Watts Gang.

45.    Defendants Cline and Kirby also knew, before the Watts Gang engineered plaintiff's above-described wrongful arrest, unreasonable search, detention, and prosecution, that, absent intervention by the Chicago Police Department, Watts and his gang would continue to engage in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, unreasonable searches, and manufacturing false charges.

46.    The Internal Affairs Division of the Chicago Police knew about the lawlessness of Watts and his gang in 2004 or earlier.

47. Defendants Cline and Kirby had the power and the opportunity to prevent Watts and his gang from continuing to engage in the above-described wrongdoing.

48. Defendants Cline and Kirby deliberately chose to turn a blind eye to the pattern of wrongdoing by Watts and his gang.

49. As a direct and proximate result of the deliberate indifference of defendants Cline and Kirby, Watts and his gang continued to engage in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrest, detention, unreasonable search, and prosecution of plaintiff, as described above.

## VI. Official Policies and Customs of the Chicago Police Department Were the Moving Force behind the Defendants' Misconduct

50. At all relevant times, the Chicago Police Department maintained official policies and customs that facilitated and condoned the Defendants' misconduct.

### A. Failure to Discipline

51. At all relevant times, the Chicago Police Department maintained a policy or custom of failing to discipline, supervise, and control its officers. By maintaining this policy or custom, the City caused its officers to believe

that they could engage in misconduct with impunity because their actions would never be thoroughly scrutinized.

52.     Before plaintiff's arrest, policymakers for the City of Chicago knew that the Chicago Police Department's policies or customs for disciplining, supervising, and controlling its officers were inadequate and caused police misconduct.

53.     Despite their knowledge of the City's failed policies and customs for disciplining, supervising, and controlling its officers, the policymakers failed to take action to remedy these problems.

54.     Before the Watts Gang engineered plaintiff's above-described wrongful arrest, detention, and prosecution, each of the individual officer defendants had been the subject of ten or more formal complaints of official misconduct.

55.     As a direct and proximate result of the Chicago Police Department's inadequate policies or customs for disciplining, supervising, and controlling its officers and the policymakers' failure to address these problems, Watts and his gang continued to engage in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes,

including but not limited to the wrongful arrest, detention, and prosecution of plaintiff, as described above.

### B. Code of Silence

56.     At all relevant times, the Chicago Police Department maintained a "code of silence" that required police officers to remain silent about police misconduct. An officer who violated the code of silence would be severely penalized by the Department.

57.     Police officers are trained at the Chicago Police Academy not to break the code of silence. Officers are instructed that "Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

58.     This "code of silence" facilitated, encouraged, and enabled the individual officer defendants to engage in egregious misconduct for many years, knowing that their fellow officers would cover for them and help conceal their widespread wrongdoing.

59.     Consistent with this "code of silence," the few people within the Chicago Police Department who stood up to Watts and his gang or who

attempted to report their misconduct were either ignored or punished, and the Watts Gang was able to engage in misconduct with impunity.

60. Watts and his gang are not the first Chicago police officers who were allowed to abuse citizens with impunity over a period of years while the City turned a blind eye.

61. One example of this widespread practice is Chicago police officer Jerome Finnigan, who was convicted and sentenced on federal criminal charges in 2011. One of the charges against Finnigan involved his attempt to hire a hitman to kill a police officer whom Finnigan believed would be a witness against him.

62. Finnigan was part of a group of officers in the Defendant City's Special Operations Section who carried out robberies, home invasions, unlawful searches and seizures, and other crimes.

63. Finnigan and his crew engaged in their misconduct at around the same time that plaintiff was subjected to the abuses described above.

64. Finnigan, like the individual officer defendants in this case, had been the subject of many formal complaints of misconduct.

65. Finnigan revealed at his criminal sentencing hearing in 2011, "You know, my bosses knew what I was doing out there, and it went on and on. And this wasn't the exception to the rule. This was the rule."

66. Defendants Watts and Mohammed were criminally charged in federal court in February 2012 after shaking down a federal informant they believed was a drug dealer.

67. Defendant Mohammed pleaded guilty in 2012.

68. Defendant Watts pleaded guilty in 2013.

69. In the case of *Obrycka v. City of Chicago et al.*, No. 07-cv-2372 (N.D. Ill.), a federal jury found that as of February 2007 "the City [of Chicago] had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

70. In December 2015, Chicago Mayor Rahm Emanuel acknowledged the continued existence of the code of silence within the Chicago Police Department; Emanuel, speaking in his capacity as Mayor, admitted that the code of silence leads to a culture where extreme acts of abuse are tolerated.

71. In April 2016, the City's Police Accountability Task Force found that the code of silence "is institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

72. In an official government report issued in January 2017, the United States Department of Justice found that "a code of silence exists, and officers and community members know it."

73. The same code of silence in place during the time period at issue in the *Obrycka* case and recognized by the Mayor, the Task Force, and the Department of Justice was also in place when plaintiff suffered the wrongful arrest, detention, and prosecution, as described above.

74. As a direct and proximate result of the City's code of silence, Watts and his gang continued to engage in robbery, extortion, the use of excessive force, planting evidence, fabricating evidence, and manufacturing false charges against persons at the Ida B. Wells Homes, including but not limited to the wrongful arrest, detention, and prosecution of plaintiff, as described above.

**VII. Claims**

75. As a result of the foregoing, all of the defendants caused plaintiff to be deprived of rights secured by the Fourth and Fourteenth Amendments.

76. As a supplemental state law claim against defendant City of Chicago only: as a result of the foregoing, plaintiff was subjected to a malicious prosecution under Illinois law.

77. Plaintiff hereby demands trial by jury.

WHEREFORE plaintiff requests that appropriate compensatory and punitive damages be awarded against the individual defendants and that appropriate compensatory damages only be awarded against defendant City of Chicago, and that the Court award fees and costs against defendants.

/s/ Joel A. Flaxman
Joel A. Flaxman
ARDC No. 6292818
Kenneth N. Flaxman
KENNETH N. FLAXMAN P.C.
200 S Michigan Ave, Ste 201
Chicago, IL 60604
(312) 427-3200
jaf@kenlaw.com
*attorneys for plaintiff*